UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PAUL McANALLY, et al., } | |
| } | |
| **Plaintiffs,** } | |
| } | |
| v. } | Case No.: 2:19-cv-02033-RDP |
| } | |
| ALABAMA PLUMBING } | |
| CONTRACTOR, et al, } | |
| } | |
| **Defendants.** } | |

## MEMORANDUM OPINION AND ORDER

This case is before the court on Plaintiffs' Fourth Opposed, Renewed, and Amended Motion to Certify FLSA Claims as a Collective Action. (Doc. # 64). Plaintiffs' Motion seeks to certify "a collective action as to all non-exempt current and/or former employees of Defendant that held and/or hold the position of plumber and/or apprentice" for the period December 17, 2016 through December 15, 2019. (*Id.*). The Motion has been fully briefed. (Docs. # 66, 67, 72, 89). For the reasons explained below, the Motion is due to be denied.

**I.     Background**

Plaintiffs all worked for Alabama Plumbing Contractor LLC ("APC") as licensed plumbers or as plumbers' assistants/apprentices. (Doc. # 69 at 3). APC provides plumbing services at various commercial jobsites. (Docs. 66-1 at ¶ 2; # 89-1 at 9-11; # 89-2 at 9-10; # 89-3 at 9-10). APC has a shop located in Shelby County, Alabama, where it keeps company-owned trucks, some parts, and supplies. (Docs. # 74-1 at 36, 37, 42; # 76-1 – 76-6; # 79-4 at 13-14). APC employed approximately twenty (20) plumber and apprentices, total, at any one time over the last few years. (Doc. # 77-2).

Plaintiffs have testified that they were instructed to report to APC's shop in the mornings to, among other things, receive job assignments and instructions; gather supplies and parts, and

load or hook up heavy equipment and machinery needed that day to perform their job. (Docs. # 76-1 – 76-6). Plumbing supply vendors also frequently provided coffee and biscuits to APC employees at the shop in the morning. (Doc. # 66-1 at 6).

Brent Vacarella, an owner of APC, has presented evidence in his sworn declaration that no plumber was required to appear at the shop in the morning. (Doc. # 66-1 at 5-7). As noted below, this evidence is in some ways disputed. But according to Vacarella, job instructions were communicated to plumbers in person at jobsites for subsequent days' work and by telephone and/or text. (Doc. # 66-1 at 5-7).

Vacarella testified that he provided the trucks as a convenience, and that APC paid for the gas used in driving the trucks. (Doc. # 66-1 at 5-7). If APC's trucks were used for transportation, Vacarella required the trucks to be brought back to the shop because APC had more insurance coverage if the company trucks were kept there. (Doc. # 74-1 at 31). Employees could only take the trucks home if they obtained permission. (Doc. # 74-1 at 44-46).

In support of their Motion to Certify, Plaintiffs presented the sworn statements of Plaintiffs Donnie Hoffman (Doc. # 57-1) and Jason Kirby (Doc. # 57-2), and of non-party Dallas Gray (Doc. # 57-3).

In his statement, Hoffman explained that he "and other plumbers and employees were required to report to APC's shop in the mornings to get the trucks, get supplies from the shop and go to the supply store and buy supplies if we needed them for the job that day. We were then required [] to drive from the job sites back to the shop at the end of the day and drop off trucks." (Doc. # 57-1). Hoffman admitted that there were exceptions to this rule. (*Id.*). Moreover, Hoffman testified:

> I'm a grown man. I could drive my personal vehicle wherever I want. But by where I was working, we get in work truck every day. Why would I just drive my personal

> vehicle to a job when we're required to get in a work truck every morning? It just don't make sense.
>
> So no, I didn't drive my personal vehicle ever to a job unless I had like a doctor's appointment or something. I would never want to waste that much gas. It was expensive to drive.

(Doc. # 89-5 at 57). It was "not an option" for Hoffman to drive his own vehicle to jobsites "[b]ecause I'm smarter than that, and I wouldn't want to waste gas. I made it not an option for me." (Doc. # 89-5 at 58). Hoffman testified that while he was employed with APC, all trucks had to be returned to the shop at the end of the day. (Doc. # 89-5 at 47).

In his statement, Kirby testified that he "and other plumbers and employees" were required to report to the APC shop in the morning "to get the trucks, get supplies and job assignments on occasion" and "drive from the job sites back to the shop at the end of the day on many occasions." (Doc. # 57-2). In his deposition, however, Kirby testified that, on most days, he rode his motorcycle from his home directly to the jobsite. (Doc. # 89-4 at 18-19).

Before Plaintiffs filed the current Motion to Certify, they had filed an Unopposed Consent Motion for Leave to Amend Complaint and add Dallas Gray as a Plaintiff. (Doc. # 55). The court denied that Motion because it was filed while the case was stayed to allow the parties to mediate the case. (Doc. # 56). In his sworn statement filed in support of certification, Gray stated that he "and other employees were required to report to the APC shop in the morning to get the trucks, get supplies and job assignments on occasion" and "drive from the job sites back to the shop at the end of the day on many occasions." (Doc. # 57-2).

Plaintiff Todd Clark met at the APC shop in the morning to drive to the jobsite because he lacked dependable transportation. (Doc. # 66-4 at 3-4). Vacarella paid to fix Clark's transmission so that he could even get to the shop. (*Id.*).

3

There is also evidence that approximately half of APC's plumbers and assistants drove their own vehicles directly from their homes to the jobsites and back. (Doc. # 66-1 at 5-7). Plaintiff McAnally testified that Justin Nichols took his own vehicle straight to the job site. (Doc. # 66-4 at 2).

Plaintiff Allen Simmons drove directly to the jobsite approximately four out of every five times. (Doc. # 89-7 at 11). During a certain period of time while working for APC, Allen rode to work with his brother Daniel Simmons, who also worked for APC. (Doc. # 89-7 at 14). But he also occasionally rode to work as a passenger in one of the APC trucks. (Doc. # 89-7 at 20-23). Notably, in relation to the current Motion, at the end of his deposition, Allen Simmons indicated that he did not want to continue to pursue his claims against APC, so he voluntarily dismissed them. (Docs. # 89-7 at 30-31; # 70, #71).

## II.   Standard of Review

Title 29 U.S.C. 216(b) provides an "opt-in" collective action for multiple plaintiffs who are "similarly situated." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1258 (11th Cir. 2008) ("To maintain a collective action under the FLSA, plaintiffs must demonstrate that they are similarly situated."). The purpose of such a collective action is "to avoid multiple lawsuits where numerous employees have allegedly been harmed by a claimed violation or violations of the FLSA by a particular employer." *Prickett v. Dekalb County*, 349 F.3d 1294, 1297 (11th Cir. 2003). A district court has the discretion to conditionally certify a collective action if doing so would permit the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged ... activity." *Hoffman–La Roche, Inc. v. Sperling*, 493 U.S. 165, 169-70 (1989).  The Eleventh Circuit has made clear that before exercising that discretion and "facilitating notice, a district court should satisfy itself that there are other employees who desire to 'opt-in' and who are

'similarly situated' with respect to their job requirements and with regard to their pay provisions." *Morgan*, 551 F.3d at 1259; *see also Dybach v. State of Fla. Dep't of Corrs.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991) ("there must be other employees of the [defendant-] employer who desire to "opt-in" and are "similarly situated").

"A plaintiff has the burden of showing a "reasonable basis" for his claim that there are other similarly[-]situated employees." *Morgan*, 551 F.3d at 1260 (citations omitted). Thus, "[t]he burden is on the plaintiffs to make an evidentiary showing that they and the proposed class are similarly situated, not on the defendants to disprove such similarity." *Saxton v. Title Max of Alabama, Inc.*, 431 F.Supp.2d 1185, 1188 (N.D. Ala. 2006) (citing *Reed v. Mobile County Sch. Sys.*, 246 F.Supp.2d 1227, 1232 (S.D. Ala. 2003)). Further, a plaintiff "must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions. . . ." *Marsh v. Butler Cnty. Sch. Sys.*, 242 F.Supp.2d 1086, 1093 (M.D. Ala. 2003) (citing *White v. Osmose, Inc.,* 204 F.Supp.2d 1309 (M.D. Ala. 2002)).

In *Hipp v. Liberty National Life Insurance Co.*, the Eleventh Circuit "suggest[ed]" a "two-tiered approach to certification of § 216(b) opt-in classes" to assist district courts in resolving the similarly situated inquiry. 252 F.3d 1208 (11th Cir. 2001).

> The first determination is made at the so-called "notice stage." At the notice stage, the district court makes a decision-usually based only on the pleadings and any affidavits which have been submitted-whether notice of the action should be given to potential class members.
>
> Because the court has minimal evidence, this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class. If the district court "conditionally certifies" the class, putative class members are given notice and the opportunity to "opt-in." The action proceeds as a representative action throughout discovery.

> The second determination is typically precipitated by a motion for "decertification" by the defendant usually filed after discovery is largely complete and the matter is ready for trial. . . .

*Hipp*, 252 F.3d at 1218.

But this is not the usual case. Ordinarily, at the notice stage, the parties have not yet conducted extensive discovery directed at the factual issues and FLSA claims. Here, the parties have done so. In fact, discovery has been completed. The court has ruled on Plaintiffs' Motion for Summary Judgment. Obviously, this litigation has progressed well beyond the point that courts usually entertain an early motion for notice. Also, in the usual circumstance, a case has been just recently filed and potential opt in plaintiffs may not be aware of its existence. That does not appear to be the situation here.

"The rationale [for a more lenient standard of analysis that may apply at the preliminary stage of a case like *Hipp*] disappears ... once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures." *Davis v. Charoen Pokphand (USA), Inc.*, 303 F.Supp.2d 1272, 1276 (M.D. Ala. 2004) (citing *White*, 204 F.Supp.2d at 1313 n. 2; *Brooks v. BellSouth Telecomms., Inc.*, 164 F.R.D. 561, 566 (N.D. Ala.1995)). After discovery is complete, a plaintiff "must rely on the evidence, and all the evidence will be considered, not just [plaintiffs' evidence]." See *Pickering v. Lorillard Tobacco Co.*, 2012 WL 314691, at *9 (M.D. Ala. Jan. 30, 2012). Moreover, at this advanced stage of a case, a court must more seriously consider its "responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation." *Thedford v. Drive In of Evansville, Inc.*, 2014 WL 5520954, at *3 (N.D. Ala. Oct. 31, 2014) (quoting *Brooks*, 164 F.R.D. at 567)).

Finally, "the mere fact that [FLSA] violations occurred cannot be enough to establish similarity, as that would not ultimately be sufficient to establish a pattern and practice without a

showing that the violations were more than sporadic occurrences." *Marsh*, 242 F.Supp.2d at 1094; *Hilley v. Tacala, L.L.C.*, 2014 WL 1246364 at *15-16 (N.D. Ala. 2014). Rather, a plaintiff must demonstrate a "pattern" of FLSA violations that "stem from [defendant's] formal or informal policy." *Id.*; *see also Morgan*, 551 F.3d at 1264. Where no wide-spread or across-the-board FLSA violations can be pointed to, an "individualized analysis of the specific minimum wage and overtime compensation violations" would be necessitated for each and every member of the proposed collective action." *Hilley* 2014 WL 1246364 at 15−16 (citing *Ledbetter v. Pruitt Corp.*, 2007 WL 496451 at *5 (M.D. Ga. Feb. 2007)). And, "such an individualized analysis runs directly counter to 'the economy of scale' envisioned by collective treatment of similarly situated employees under § 216(b) of the FLSA." *Id.* (citing *Ledbetter*, 2007 WL 496451 at *5 (in turn citing *Horne v. United Servs. Auto Ass'n*, 279 F.Supp.2d 1231, 1237 (M.D. Ala. 2003))).

"Under *Dybach's* first requirement, a plaintiff must show that there are other employees who desire to opt-in before a court can conditionally certify a class." *Kemar Fung Chung v. Affordable Battery, Inc.*, 2012 WL 3759029, at *1 (S.D. Fla. Aug. 29, 2012) (citing *Dybach*, 942 F.2d at 1567–68). "In making this showing, a plaintiff cannot rely on speculative, vague, or conclusory allegations." *Id.* (citations omitted). "Evidence of similarly situated employees who desire to opt in may be based on affidavits of other employees, consents to join the lawsuit filed by other employees, or expert evidence on the existence of other similarly situated employees," but "plaintiff's or counsel's belief in the existence of other employees who desire to opt in and unsupported expectations that additional plaintiffs will subsequently come forward are insufficient to justify certification of a collective action and notice to a potential class." *Kirk v. Dr. Goodroof, Inc.,* 2015 WL 1138445, at *2 (M.D. Fla. Mar. 13, 2015) (quoting *Hart v. JPMorgan Chase Bank, N.A.*, 2012 WL 6196035, at *4 (M.D. Fla. Dec. 12, 2012) (alteration in original)).

**III.    Analysis**

To prevail on their Motion, Plaintiffs must demonstrate that individualized inquiries will not dominate the case, *Hilley* 2014 WL 1246364 at 15−16, and that other employees have an interest in opting-in to this litigation. *Pickering*, 2012 WL 314691 at *12. (citation omitted). "[U]nsupported expectations that additional plaintiffs will subsequently come forward" are insufficient. *Mackenzie v. Kindred Hosps. East, L.L.C.*, 276 F.Supp.2d 1211, 1220 (M.D. Fla. 2003).

Although Plaintiffs have presented evidence that Defendants' policies applied to a number of other plumbers and assistants, the evidence, taken as a whole, does not establish that those policies were uniform. There is evidence showing that approximately half of the plumbers and assistants (1) did not report to the APC shop in the morning and (2) did not engage in the activities for which Plaintiffs allege they are due overtime compensation. Because the evidence shows that there were differences even between the named Plaintiffs as to the tasks for which they seek overtime compensation, an evaluation of Plaintiffs' claims will require "individualized analysis [that] runs directly counter to 'the economy of scale' envisioned by collective treatment of similarly situated employees under § 216(b) of the FLSA." *Hilley* 2014 WL 1246364 at 16.

During discovery, Defendants produced to Plaintiffs a list of employees for approximately the two-year period preceding the filing of the Complaint. (Doc. # 39-1 at row 29). Eight named Plaintiffs were included in Plaintiffs' Fourth Amended Complaint. (Doc. # 52). Written discovery and depositions[1] have taken place. Only one additional Plaintiff, Dallas Gray, has sought to join

---

[1] The court is disappointed in how counsel have litigated this case. This exchange, which occurred during the deposition of Donnie Hoffman, is unfortunately characteristic of all counsel's behavior:

> Q. Let me show you what I've marked as Exhibit 1. Can you tell me what those documents are?
> MR. HARWELL: Do you have a copy of those for me?
> MR. HANCOCK: I produced them to you.
> MR. HARWELL: No. I want a copy of what you're showing my client so I can see them.

8

> MR. HANCOCK: You can share.
> MR. HARWELL: Can I go make a copy, Will?
> MR. HANCOCK: There's a Kinko's down the hill.
> MR. HARWELL: No, sir. You are showing my client an exhibit, and I have a right to see what you're showing him.
> MR. HANCOCK: Well, look at it.
> MR. HARWELL: And we're supposed to be 6 feet apart, Will. So, no, I can't share. I need to be able to see this as you question him. So can you please have your secretary make a copy of an exhibit you're showing my client?
> MR. HANCOCK: It's right there. You can look at it.
> MR. HARWELL: I made you copies, yesterday, sir.
> So you have an exhibit. Please make a copy of it.
> MR. HANCOCK: This is my copy.
> MR. HARWELL: Well, it's staying with me now.
> MR. HANCOCK: No, it's not, Scott.
> MR. HARWELL: Yes, it is. I have a right to copies of exhibits, Will.
> MR. HANCOCK: If you buy them from the court reporter.
> MR. HARWELL: No.
> . . . .
> MR. HANCOCK: Can I see that, Scott?
> MR. HARWELL: Can I please get a copy?
> MR. HANCOCK: Hand it to me.
> MR. HARWELL: Can I please get a copy?
> MR. HANCOCK: Hand me my paper.
> MR. HARWELL: You go get me a copy, please. Or either I'll take this down to Kinko's and make a copy of it.
> MR. HANCOCK: Okay. Go. We'll wait.
> MR. HARWELL: No.
> MR. HANCOCK: Scott, I have produced –
> MR. HARWELL: It's your professional obligation to give -- you have not produced this particular document. You have produced 6,500 pages. You have not produced these documents in this format, sir. You have not.
> Can you state on the record, as an officer of the court, that you have produced these documents that I've requested, just the time sheets for Mr. Hoffman and only the time sheets for Mr. Hoffman? You've produced 6,500 pages in a document dump. I'm asking you to please go make a copy of this exhibit. I'll pay the 10 cents a copy, Will. What do you charge your client? I'll pay for it. I've got cash. I've got a check. I've got a debit card. What do you charge your client for copies? And I'll pay for it. Okay? Can I agree to pay for the copy, Will?
> MR. HANCOCK: Are you through?
> MR. HARWELL: I asked you a question. I'll pay for the copy.
> Q. Mr. Hoffman, can you look at Exhibits 1 and 2 and tell me –

(Doc. # 89-5 at 11-14). That banter continued:

> MR. HANCOCK: Scott, I need my copy back.
> MR. HARWELL: I need a copy.
> MR. HANCOCK: Hand it to me.
> MR. HARWELL: No. You can go make me a copy. This is my copy to my client's deposition.
> MR. HANCOCK: Scott, it's not. Give it to me.
> MR. HARWELL: No. You can go get your secretary -- if we were at my office right now in my conference room, I could print it out. I would make a copy of it.
> I'm asking you, sir, to ask your secretary to print you out a copy or to print something for me. I have offered to pay for it.
> MR. HANCOCK: Scott, I just handed you my copy to look at. I want it back.
> MR. HARWELL: No. This is my copy.

9

the case, and one Plaintiff named in the Fourth Amended Complaint has voluntarily dismissed his claims against Defendants.

With the exception of Dallas Gray, Plaintiffs have presented no evidence that there are others who are interested in participating in this litigation. Mere evidence of other alleged FLSA violations is not a reasonable basis for concluding that other employees will be interested in joining this lawsuit. *See Mackenzie*., 276 F. Supp. 2d at 1220. And, "certification of a collective action and notice to a potential class is not appropriate to determine whether there are others who desire to join the lawsuit." *Rodgers v. CVS Pharmacy, Inc*., 2006 WL 752831, at *3 (M.D. Fla. Mar. 23, 2006) (citing *Mackenzie*, 276 F.Supp.2d at 1220 (in turn citing *Dybach*, 942 F.2d at 1567-68))). The Eleventh Circuit has instructed that a showing that others desire to opt-in must be made *before* notice is authorized. *See Dybach*, 942 F.2d at 1567–68.

---

> MR. HANCOCK: I want it back to ask questions.
> MR. HARWELL: No. Print out a copy, Will, for me.
> MR. HANCOCK: Scott, hand it to me.
> MR. HARWELL: No. You can go print out a copy for you.
> MR. HANCOCK: Then you and Mr. Hoffman can share that one.

(*Id.* at 18-10).

> MR. HARWELL: Let me see that. I'm going to make a picture of it and e-mail it to him. That way, he can make it an exhibit. Because that's what professionals should do for one another when they're asked.
> MR. HANCOCK: Have you e-mailed it?
> MR. HARWELL: I'm doing it now. Do you think you could forward that document that your client e-mailed to you yesterday that you refused to send to me, Will?
> Will, did you hear me? That e-mail that I asked you to forward to me yesterday that you refused to do so, I still haven't gotten it.
> MR. HANCOCK: I'm not sure what document you're talking about.
> MR. HARWELL: The GPS record that Mr. Vacarella sent you while I was taking his deposition, and you refused to even look at your phone and provide me the document.
> MR. HANCOCK: I haven't looked at that yet.

(*Id.* at 44-45). This nonsense continued to the point that, during the next day's depositions, Mr. Harwell retrieved a copier from his vehicle to make his own copies. (Doc. # 89-2 at 30-31). Moreover, Mr. Hancock initially refused to file entire deposition transcripts in his evidentiary submissions (*see* Docs. # 66-3, # 66-4), until the court directed otherwise. (Doc. # 88). The court only can think of one reaction to this and other adolescent litigation tactics in this case: Really!?!

In *Manzi v. Hartman and Tyner, Inc.*, 2011 WL 2672343, at *2 (S.D. Fla. July 8, 2011), the plaintiff sought certification of an FLSA collective action on behalf of himself and other poker dealers for whom the employer took a "tip credit" without complying with the "tip credit" requirements of the FLSA. Although the plaintiff submitted three affidavits from other employees who, if permitted to do so, potentially would opt-in, the court held that the plaintiff failed to satisfy his burden of showing that other similarly situated employees wished to join the litigation. *Id*. at *2. As the court observed:

> [N]either Plaintiff nor his affiants have suggested that there are any additional employees, other than themselves, who desire to opt-in. Plaintiff has not submitted any sworn testimony that he knows of any other poker dealers willing to join the suit, nor do any of the affidavits ... declare knowledge of other potential plaintiffs.

*Id*. at *3. The court concluded that "[e]ven after this case has been pending for almost five months, there is still no reason for the Court to believe that anyone else wishes to join this suit. . . ." *Id*. Here, this action has been pending for sixteen months.

In *David v. Associated Out–Door Clubs, Inc*., 2010 WL 1730702 (M.D. Fla. April 27, 2010), the two named plaintiffs and two other employees who had filed consents "filed identical affidavits, which claim that they know of others who 'expressed interest[ ] in the case, but they are too scared to join in the law suit [sic] because they still work for Defendant.'" *Id*. In denying conditional certification, the court observed that none of the four identified any other employee interested in joining, either in their affidavit or in deposition. *Id*.

Plaintiffs must demonstrate a reasonable basis for concluding that there are other employees who desire to opt-in before a court should conditionally certify a class. *Haynes*, 696 F.2d at 887. Discovery is now complete. Plaintiffs have not satisfied that burden.[2]

---

[2] Moreover, other district courts have declined to certify classes when there appear to be only a few potential plaintiffs. *See, e.g., Smith v. Washington County Kennel Club, Inc*., 2014 WL 4627437 (N.D. Fla. 2014) (finding five additional opt in members insufficient to certify a class); *Latortue v. Fast Payday Loans, Inc*., 2010 WL 557712 (M.D.

**IV.     Conclusion**

For all of the foregoing reasons, Plaintiffs' Fourth Opposed, Renewed and Amended Motion to Certify FLSA Claims as a Collective Action (Doc. # 64) is **DENIED**.

To the extent Dallas Gray still seeks to join this lawsuit, Plaintiffs are granted leave to file an amended complaint adding him as a Plaintiff, but making no other substantive changes to the current operative complaint.

**DONE** and **ORDERED** this April 29, 2021.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

Fla. 2010) (finding adding five opt-in plaintiffs was not sufficient to certify a class); *Rappaport v. Embarq Mgmt. Co.*, 2007 WL 4482581 (M.D. Fla. Dec.18, 2007) (finding six opt-in affidavits insufficient to certify class*); Sanders v. Drainfield Doctor, Inc.*, 2007 WL 1362723 (M.D. Fla. 2007) (finding class of twelve employees not large enough to justify class treatment).